UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
Estate of Ryan Rodriguez,    :
Joe Rodriguez and            :
Carol Rodriguez,             :
Co-Administrators            :
         Plaintiffs,         :
                             :
       v.                    :   File No. 2:06-CV-125
                             :
Jay Simon,                   :
Correctional Medical         :
Services, Inc.,              :
Edward Dionne,               :
Joshua Rutherford,           :
Michael Carbonneau, and      :
John Arzuaga                 :
         Defendants.         :
```

## MAGISTRATE JUDGE'S REPORT & RECOMMENDATION
(Paper 14 & 31)

Plaintiffs Joe and Carol Rodriguez filed this action

on behalf of the Estate of Ryan Rodriguez against Jay

Simon, Correctional Medical Services, Inc. ("CMS"), Edward

Dionne, Joshua Rutherford, Michael Carbonneau, and John

Arzuaga, alleging constitutional violations pursuant to 42

U.S.C. § 1983, gross negligence, and medical malpractice

pursuant to 12 V.S.A. § 1908, arising from the suicide of

their son Ryan Rodriguez while he was in the custody of the

Vermont Department of Corrections ("DOC").  The case is

currently before the Court on defendants Simon, Rutherford

and Carbonneau's motion to dismiss the Amended Complaint
for failure to state a claim upon which relief may be
granted under Fed. R. Civ. P. 12(b)(6).

For the following reasons, I recommend the motion be
DENIED.

## I. <u>BACKGROUND</u>

### A. <u>Facts</u>

The following facts are presumed to be true for the
purpose of the pending motion.  Plaintiffs Joe and Carol
Rodriguez are the duly appointed co-administrators of the
Estate of Ryan Rodriguez. (Paper 28, ¶ 3).  Defendant Simon
is the superintendent of the Chittenden Regional
Correctional Facility ("CRCF"), in South Burlington,
Vermont. (<u>Id.</u> at ¶ 4).  Defendants Carbonneau and
Rutherford are correctional officers employed by the
Vermont Department of Corrections at the Northern State
Correctional Facility ("NSCF") in Newport, Vermont and the
CRCF respectively.  (<u>Id.</u> at ¶¶ 9-10).

Ryan Rodriguez was a pre-trial detainee between
September 11, 2003 and October 18, 2004 at both CRCF and
NSCF.  On or about October 18, 2004, he committed suicide
by hanging himself in his cell at CRCF. (Paper 28, ¶ 13).

The Amended Complaint alleges that the individual correctional officers knew that Rodriguez had been assessed as a suicide risk, but failed to give him the mental health treatment and procedural safeguards to prevent his suicide. (Id. at ¶¶ 28, 33-35, 78, 80-81, 90, 91, 93, 98, 100).  The plaintiffs allege that the defendants were deliberately indifferent to the known risk of substantial injury to Rodriguez, were grossly negligent in the discharge of their respective duties, and acted with wilful and wanton disregard of Rodriguez's rights. (Id. at 101).

On September 11, 2003, upon admission to CRCF, Rodriguez presented with suicidal ideation and, based on answers from an Initial Needs Survey, was put on 15-minute observation checks. (Paper 28, ¶¶ 14-15).  The next day Arzuaga, a mental health clinician, diagnosed Rodriguez with an adjustment disorder and removed him from 15 minute checks. (Id. at ¶ 17).  On September 22, 2003, Rodriguez was transferred from CRCF to NSCF and his Health Services Transfer Form indicated under Mental Health Special Concerns: "I/M states if convicted of crime, plans suicide-MH referral." (Id. at ¶ 24).  Upon his arrival at NSCF Carbonneau placed Rodriguez on 15-minute checks again after

3

an Initial Needs Survey indicated Rodriguez's continued
suicide plans.  (Id. at ¶¶ 26-28).  Carbonneau, however,
did not notify a mental health professional or a supervisor
after learning Rodriguez was a suicide risk. (Id. at ¶ 28).
Apparently, no mental health assessment was completed at
NSCF.  (Id. at ¶ 29).

On December 1, 2003, Rodriguez was returned to CRCF
where Rutherford completed an Intake Medical Screening form
and an Initial Needs Survey of Rodriguez. (Paper 28, ¶¶ 30,
32-33).  On the Initial Needs Survey Rodriguez indicated
that he had nothing to look forward to. (Id. at ¶ 33).
This response triggered a need for further observation,
evaluation and assessment. (Id. at ¶ 34).  Nevertheless,
Rutherford did not place Rodriguez on 15-minute checks,
notify his supervisor, or contact a qualified mental health
professional.  (Id. at ¶ 35).

Rodriguez was transferred to NSCF again on December 4,
2003 before his final return to CRCF on April 8, 2004.
While at NSCF, Rodriguez saw mental health providers twice,
once through a referral on December 22 and once by his
request on January 9.  The progress note from January 9
indicated Rodriguez was "Anxious; concerned" regarding his

4

charges and the repercussions they might have both in the DOC atmosphere and in the community, and recommended he be seen "upon request." (Id. at 41).  Upon his return to CRCF on April 8, 2004, he was placed in administrative segregation - where he remained until his death - and CRCF staff failed to complete four admission forms.[1] (Id. at ¶¶ 43-47).  Simon knew and approved of Rodriguez's placement. (Id. at ¶ 50, 94).  Simon also knew Rodriguez had been assessed as a suicide risk, had no established treatment plan, and that segregation may exacerbate his condition. (Id. at ¶¶ 90-91, 93).  In addition, Simon was aware of at least two suicides by inmates in segregation in the year before Rodriguez took his life and that the segregation unit did not have a sole correctional officer assigned to all shifts. (Id. at ¶¶ 48, 50, 89, 91)

After attending a sentencing hearing on August 23, 2004 at which he learned the judge might impose a longer sentence, Rodriguez began refusing food at CRCF. (Id. at ¶¶ 51, 53).  Three Mental Health Referral forms were completed on August 28, 2004 regarding Rodriguez's week-long refusal

---

[1] The forms not completed on April 8 were the Health Services Reception Form, the Initial Needs Survey, the Intake Medical Screening, and the Mental Health Intake Assessment.

to eat, which surmised that the "[c]ourt situation brought this on" and that Rodriguez had "mild paranoia" and was "withdrawn within his room."  (<u>Id.</u> at ¶¶ 53, 55, 57).  In addition, the correctional officer who completed one of the forms noted that Rodriguez "was not like this a few weeks ago" . . . "[has] changed dramatically" . . . "has been placed in a cell by himself." (<u>Id.</u> at ¶ 57).

     After a call from his attorney on October 18, 2004 informing him that the jury draw for his case would be delayed until the end of November, Rodriguez told a fellow inmate that he did not feel right and might hurt himself. (Paper 28, ¶¶ 61-62).  Thereafter, he twice asked Dionne if he could talk to someone.  (<u>Id.</u> at ¶ 63).  Another inmate also told Dionne that Rodriguez felt like hurting himself. (<u>Id.</u> at ¶ 65).  In addition, around 11:30 pm on October 18 Rodriguez refused an incoming inmate as a roommate. (<u>Id.</u> at ¶ 68.)  A nearby inmate with whom Dionne attempted to place the new inmate told Dionne that Rodriguez should have a roommate because he was talking about killing himself earlier. (<u>Id.</u> at ¶¶ 68-69).  Rodriguez never received a roommate and never spoke to a mental health professional that night.  Approximately one hour later, at 12:20 am,

Rodriguez was found hanging by a shoestring attached to a grate in his cell. (Id. at ¶¶ 67, 70).  He was transported to Fletcher Allen Health Care and removed from life support on October 24, 2004.

B. This Lawsuit

On June 26, 2006, the plaintiffs brought suit against CMS, Dionne, and Simon, the DOC, and Kathleen Lanman.  The state defendants moved to dismiss the Complaint in part on August 18, 2006. (Paper 14).  Plaintiffs then moved to amend the complaint. (Paper 21).  The Court heard oral argument on November 15, 2006 and ordered the parties to stipulate to dismissing claims against the State, state employees in their official capacity, and Kathleen Lanman in her individual capacity.  On January 18, 2007, the Court granted plaintiffs' motion to amend the complaint and ordered defendants to supplement their motions to dismiss based on the Amended Complaint to address claims asserted therein. (Text only Order).  Plaintiffs filed the Amended Complaint on January 22, 2007.  (Paper 28).  The Amended Complaint named Carbonneau, Rutherford and Arzuaga as new defendants and also added allegations with respect to Simon.  Defendants Simon, Carbonneau and Rutherford now

move to dismiss all claims against them in the Amended
Complaint.[2] (Paper 31).

## II. DISCUSSION

### A. Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss for failure to state
a claim should not be granted "unless it appears beyond
doubt that the plaintiff can prove no set of facts in
support of his claim which would entitle him to relief."
Green v. Maraio, 722 F.2d 1013, 1015-16 (2d Cir. 1983)
(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  In
ruling on such a motion, the court tests the sufficiency of
the complaint by examining only the allegations in the
complaint and any documents attached to or incorporated by
reference therein.  Huminski v. Rutland County, 148 F.
Supp. 2d 373, 376-77 (D. Vt. 2001).  "The court must assume
the all well-pleaded factual allegations to be true and
view all reasonable inferences that can be drawn from such
allegations and documents in the light most favorable to
the plaintiff."  Id. at 377.  On the other hand, complaints
asserting "conclusory allegations unsupported by factual

---

[2] The Court notes that Defendant Dionne did not renew his motion to dismiss
the Amended Complaint, but was granted an extension of time to answer it.
CMS has answered the Amended Complaint, but Arzuaga has neither answered nor
moved to dismiss.

assertions," fail to meet even the liberal Rule 12(b)(6) standard.  Id. (quoting De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996)).

Here, plaintiffs allege that defendants were deliberatively indifferent to the known risk of substantial injury to Rodriguez, grossly negligent in the discharge of their respective duties regarding Rodriguez's mental health and acted with wilful and wanton disregard of his rights. (Paper 28, ¶ 101).  The allegations from the Amended Complaint are stated in two counts: (1) section 1983, Eighth and Fourteenth Amendment violations and (2) gross negligence under Vermont law.  (Id. at ¶ 103-107).

1.   42 U.S.C. § 1983

A claim for relief under 42 U.S.C. § 1983[3] need only allege that a person acting under color of state law deprived the plaintiff of a federal right.  Green, 722 F.2d at 1016.  A prerequisite to an award of damages under § 1983 is the defendant's personal involvement in the constitutional deprivation.  Colon v. Coughlin, 58 F.3d

---

[3] Section 1983 states in pertinent part:
    "Every person, who, under color of [state law] . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . ." 42 U.S.C. § 1983 (2002).

865, 873 (2d Cir. 1995); Huminski, 148 F. Supp. 2d at 378.
A complaint alleging improper medical care resulting in
serious harm or death under section 1983 can be based on
two constitutional grounds: (1) cruel and unusual
punishment under the Eighth Amendment, and (2) a denial of
due process of law under the Fourteenth Amendment.  See
Brown v. McGowan, 445 F.Supp. 468, 469 (D. Colo. 1978).
The plaintiffs here have asserted both.  The Eighth
Amendment, however, applies only to persons convicted of
crimes, while the rights of pre-trial detainees are
protected by the Fourteenth Amendment.  U.S. Const. Amend.
VIII, XIV, § 2; Cook ex rel. Estate of Tessier v. Sheriff
of Monroe County, Fla, 402 F.3d 1092, 1115 (11th Cir.
2005);  Burkett v. Wicker, 435 F. Supp. 2d 875 (N.D. Ind.
2006).

     "[T]he due process rights of a [pre-trial detainee]
are at least as great as the Eighth Amendment protections
available to a convicted prisoner." County of Sacramento v.
Lewis, 523 U.S. 833, 849-50 (1998) (emphasis added)
(quoting holding from Revere v. Mass. Gen. Hospital, 463
U.S. 239 (1983)).  Indeed, the Second Circuit has explained
that "[p]re-trial detainees do not stand on the same

10

footing as convicted inmates," but are "entitled to protection from cruel and unusual punishment as a matter of due process and, where relevant, equal protection." <u>Rhem v. Malcom</u>, 507 F.2d 333, 337 (2d Cir. 1974).  Despite the distinction between convicted inmates and pre-trial detainees, the deliberate indifference standard under the Eighth Amendment, <u>see</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-104 (1976), also satisfies "the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."  <u>County of Sacramento</u>, 523 U.S. at 850.  Accordingly, it is appropriate to apply Eighth Amendment caselaw to pre-trial detainees alleging deliberate indifference and gross negligence because such conduct can be sufficiently shocking to state a substantive due process claim pursuant to the Fourteenth Amendment. <u>Id.</u>; <u>Cuoco v. Motisqugu</u>, 222 F.3d 99, 106 (2d Cir. 2000) (noting Eighth Amendment standards apply to claims by pre-trial detainees under Fourteenth Amendment).

     To avoid dismissal of the § 1983 claim for improper medical care in prison, the Amended Complaint must allege defendants were deliberately indifferent to the known risk of substantial injury or death to Rodriguez.  A prison official is deliberately indifferent "if [the official]

11

knows that the inmate face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Farmer v. Brennan</u>, 511 U.S. 825, 850 (1994).  The deliberate indifference standard in jail suicide cases under section 1983 has three elements:

> (1) an unusually serious risk of harm (self-inflicted harm in a suicide case), (2) defendant's actual knowledge of (or, at least willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk.  The risk, knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

<u>Manarite v. City of Springfield</u>, 957 F.2d 953, 956 (1st Cir. 1992); <u>see also</u> <u>Gray v. City of Detroit</u>, 399 F.3d 612, 616 (6th Cir. 2005); <u>Rellergert v. Cape Girardeau County, Mo.</u>, 924 F.2d 794, 796 (8th Cir. 1991); <u>Simmons v. City of Philadelphia</u>, 947 F.2d 1042, 1068 (3rd Cir. 1991); <u>Belcher v. Oliver</u>, 898 F.2d 32, 34 (4th Cir. 1990); <u>Popham v. City of Talladega</u>, 908 F.2d 1561, 1563-64 (11th Cir. 1990); <u>Partridge v. Two Unknown Police Officers</u>, 791 F.2d 1182, 1187 (5th Cir. 1986).

As superintendent and officers at Vermont correctional facilities, the individual defendants were acting under color of state law during the relevant period.  The primary

issues are whether the Amended Complaint alleges facts that (1) Rodriguez posed an unusually serious risk of self-inflicted harm; (2) Simon, Carbonneau, and Rutherford knew of this risk; and (3) with this knowledge, they failed to take reasonable steps to address that risk.

As to Simon, the Amended Complaint alleges that he knew Rodriguez was a suicide risk, that segregation may exacerbate a suicide risk, yet allowed Rodriguez to be segregated without determining whether it was contraindicated. (Paper 28, ¶¶ 90-91).  Moreover, each time Rodriguez entered the CRCF his admissions paperwork indicated that he had thoughts about suicide and had nothing to look forward to. (Id. at ¶¶ 15, 19, 22).  Simon, as superintendent, had a duty to ensure he received appropriate mental health treatment and suicide prevention protocol. (Id. at ¶ 88).  Nevertheless, no detailed mental health evaluation ever occurred and no mental health treatment plan was in place despite several indications of Rodriguez's suicide risk. (Id. at ¶¶ 73-74, 93).  The allegations as to Simon are not conclusory, but supported with adequate facts to avoid a Rule 12(b)(6) dismissal. The inquiry at this stage "is not whether [the plaintiffs are] likely to prevail ultimately, but whether the

13

claimant[s] [are] entitled to offer evidence to support the claims." Huminski, 148 F. Supp. 2d at 378.

The Amended Complaint alleges that Carbonneau learned of Rodriguez's suicide risk when Rodriguez arrived at NSCF on September 22, 2003.  (Paper 28, ¶ 27).  As a result, Carbonneau put Rodriguez on 15 minute checks. (Id. at ¶ 28).  His alleged failure to take reasonable steps to reduce Rodriguez's suicide risk occurred when he failed to notify a mental health professional or casework supervisor to perform a mental health assessment and follow-up treatment.  The Court is not persuaded that under the circumstances alleged placing Rodriguez on 15 minute checks at NSCF, without more, could not be shown to rise to deliberate indifference, especially given that Rodriguez was transferred between NSCF and CRCF four times.

The allegation against Rutherford is that he knew Rodriguez was suicidal from his statement in a medical screening that he had nothing to look forward to, an indication of a suicidal thought. (Paper 28, ¶¶ 32-33, 97). Rutherford's alleged deliberate indifference to the known risk was his failure to follow up on Rodriguez's responses to the medical screening. (Id. at ¶ 34).  Specifically, Rutherford did not to put Rodriguez on 15 minute checks and

14

failed to report Rodriguez's intake medical screening responses to Rutherford's supervisor and Rodriguez's caseworker. (Id. at ¶ 98).  The Court notes that defendants dispute that Rodriguez's response to the medical screening indicated a suicide risk, triggering Rutherford's knowledge requirement under the deliberate indifference standard. (See Paper 31, at 7-8).  In reading the Amended Complaint in the light most favorable to the plaintiffs, however, the Court finds it states a § 1983 claim against Rutherford. Because the Amended Complaint alleges facts that show all three defendants knew of Rodriguez's suicide risk and failed to take reasonable preventative measures, the Court finds that the alleged failures, when taken as true, could amount to deliberate indifference. See e.g., Gordon v. Kidd, 971 F.2d 1087, 1095 (4th Cir. 1992) (jailer's disregard for warning about inmate's suicidal tendencies rises to level of deliberate indifference).  Thus plaintiffs have made sufficient allegations to survive the motion to dismiss.

     2.  Gross Negligence

     The parties agree that the Vermont Tort Claims Act, 12 V.S.A. § 5602(a), bars simple state law tort claims against state employees.  Plaintiffs argue, however, that Count II

is not barred because the Amended Complaint sets forth
allegations of gross negligence and willful misconduct.
(Paper 20, at 2).  Indeed, although section 5602 shields
state employees from suit under certain circumstances, "the
statute explicitly does not apply 'to gross negligence or
willful misconduct.'" 12 V.S.A. § 5602(b) (2002); Long v.
L'Esperance, 166 Vt. 566, 575 (1997).  Defendants contend
that plaintiffs' gross negligence claim is nevertheless
unavailing.  Having found that the Amended Complaint states
a claim that Simon, Carbonneau, and Rutherford were
deliberatively indifferent to a known risk of serious harm
to Rodriguez, the issue here is whether *a fortiori*, the
same conduct may constitute gross negligence.

    Both gross negligence and deliberative indifference
lie "between the poles of negligence at one end and purpose
or knowledge at the other."  Farmer, 511 U.S. at 836, n. 4.
Both have also been routinely equated with recklessness.
Id. at 836 n. 4 (noting while courts of appeal equate
deliberate indifference with recklessness, gross negligence
is a nebulous term "in practice typically meaning little
different from recklessness as generally understood in the
civil law.").  Under civil-law recklessness, a prison

official is grossly negligent (reckless) if he has a duty
and acts or fails to act in the face of an unjustifiably
high risk of harm that is either known or so obvious that
it should be known."  Id. at 836.  In Farmer, however, the
Supreme Court rejected the civil-law recklessness standard
for deliberate indifference, which suggests gross
negligence is slightly closer to the negligence end of the
spectrum than deliberate indifference because it imputes
knowledge on a prison official where the risk is "so
obvious that it should be known;" whereas deliberate
indifference requires the official be "both aware of facts
from which the inference could be drawn that a substantial
risk of serious harm exists, and he must also draw the
inference." Id. at 836, 837.

     The Vermont Supreme Court agrees that gross negligence
is more than "simple incompetence," Powers v. Office of
Child Support, 173 Vt. 390, 399 (2002), but less than
actual knowledge.  Long, 166 Vt. at 575 (holding jury could
have found gross negligence where officer "should have
known that his arrest of plaintiff was unlawful").  "To
sustain a claim for gross negligence, a plaintiff must
present facts that demonstrate than an individual defendant
heedlessly and palpably violated a legal duty owed to the

plaintiff." <u>Powers</u>, 173 Vt at 399.  Moreover, a court may only decide whether an individual was grossly negligent as a matter of law "when reasonable persons cannot differ on the question." <u>Id.</u>

Accordingly, based on the above analysis finding that plaintiffs stated § 1983 claims against Simon, Carbonneau, and Rutherford for their deliberate indifference to Rodriguez's serious medical need, their alleged conduct must *a fortiori* also rise to the level of gross negligence, a state law tort.  Thus, defendants' motion to dismiss Count II should be denied.

B. <u>Qualified Immunity</u>

Simon, Rutherford and Carbonneau argue that even if the Amended Complaint states a constitutional violation, they are shielded from suit by the affirmative defense of qualified immunity in Count I. (Paper 31, 5-12). Affirmative defenses are normally asserted in an answer, <u>see</u> Fed. R. Civ. P. 12(b), and "*usually*, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted." <u>McKenna v. Wright</u>, 386 F.3d 432, 435 (2d Cir. 2004) (emphasis in original)(quoting <u>Green</u>,

18

722 F.2d at 1018); Huminski, 148 F. Supp. 2d at 375 n. 1 (noting same).  Because the "fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial," Green, 722 F.2d at 1018, the mere assertion of the defense at an early stage of the pleadings - without the benefit of discovery - is not an adequate basis for dismissal unless "the defense is based on facts appearing on the face of the complaint."  McKenna, 386 F.3d at 463 (resolving issue of whether qualified immunity defense may be presented in a Rule 12(b)(6) motion to dismiss).  In McKenna, the Second Circuit distinguished "traditional qualified immunity," which prison officials asserted there, as here, from the specialized defenses relied on in the two other occasions the Circuit upheld the defense in a Rule 12(b)(6) motion.  Id.; see, e.g., Maraio, 722 F.2d at 1018-19 (permitting defense where court reporter shielded, in effect, by the immunity of the judge whose direction she followed); Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67 (2d Cir. 1998) (permitting defense of a fiscal intermediary shielded by official immunity for performing a governmental function).

Although intended to shield government officials from

suit for good faith actions in the course of employment,

Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982),

defendants presenting qualified immunity defenses in a pre-

answer dismissal motion rather than on a motion for summary

judgment, face a higher burden and

> must accept the more stringent standard applicable
> to this procedural route.  Not only must the facts
> supporting the defense appear on the face of the
> complaint, but, as with all Rule 12(b)(6) motions,
> the motion may be granted only where 'it appears
> beyond doubt that the plaintiff can prove no set
> of facts in support of his claim that would
> entitle him to relief.'

McKenna, 386 F.3d at 436 (quoting Citibank, N.A. v. K-H

Corp., 968 F.2d 1489, 1494 (2d Cir. 1992)).  Accordingly,

the plaintiffs are "entitled to all reasonable inferences

from the facts alleged, not only those that support [their]

claim, but also those that defeat the immunity defense."

Id.

There are two steps in the qualified immunity

analysis.  The first inquiry is whether the facts state a

claim that the officer's conduct violated a constitutional

right. Saucier v. Katz, 533 U.S. 194, 201 (2001).  In this

case plaintiffs have met the threshold requirement of

stating a constitutional violation.  As discussed above,

the Amended Complaint states a violation of the Due Process

Clause of the Fourteenth Amendment for defendants' failure to provide Rodriguez proper medical care as a pre-trial detainee.

We thus move to the second step, which asks whether the officials' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time of the violation. Jones v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (alterations in original). Moreover, the right must be clearly established "in light of the specific context of the case." Saucier, 533 U.S. at 201.

The Second Circuit has found that pre-trial detainees have the right to medical treatment for serious medical needs under the Fourteenth Amendment, Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996), which would include treatment to prevent suicide. Kelsey v. City of New York, No. 03-CV-

21

5978, 2006 WL 3725543, at *9 (E.D.N.Y. Dec. 18, 2006).
Thus, Rodriguez's right to be free from deliberate
indifference by these defendants while he was in Vermont
DOC custody is a clearly established right.  Id.  To
establish a qualified immunity defense, the defendants must
show that it was "objectively reasonable," Ford v.
McGinnis, 352 F.3d 582, 597 (2d Cir. 2003), for them to
believe that their response to Rodriguez's suicide risk was
not deliberatively indifferent to his needs.  McKenna, 386
F.3d at 437.

Despite the right being clearly established here, the
law regarding which preventative measures are objectively
reasonable and should be protected under the doctrine of
qualified immunity turns on the particular facts of each
case.  Rellergert, 924 F.2d at 797 ("While we conclude that
the law is clearly established that jailers must take
measures to prevent inmate suicides once they know of the
suicide risk, we cannot say that the law is established
with any clarity as to what those measures must be.").
Although the facts alleged in the Amended Complaint do not
state as clear a case of deliberate indifference to
Rodriguez's mental health needs as in McKenna, neither do
they unequivocally support a qualified immunity defense at

22

this pleading stage.  In McKenna, the plaintiff alleged a series of failures to test him for hepatitis C despite known danger signs of his disease, failure to initiate treatment when the need was apparent, failure to adhere to doctor-ordered follow-up visits, and denial of treatment based on flawed prison policies.  McKenna, 386 F.3d at 437. The Second Circuit refused to dismiss the complaint on the basis of qualified immunity because the defendants could not show, based on the allegations, that their conduct was not deliberatively indifferent to the plaintiff's clearly established right to adequate medical care or that any reasonable prison official would understand that similar behavior was lawful under such facts.  Id.

Here, as addressed earlier, the Amended Complaint alleges facts that could amount to the defendants' deliberate indifference.  Although Simon contends that it was objectively reasonable for him to believe that a qualified mental health professional had taken all necessary actions during Rodriguez's segregation, the facts at this pleading stage are equivocal at best.[4]  See

---

[4] It is not clear from on the face of the Amended Complaint that Rodriguez was seen and treated by a mental health professional on August 20 during his time in segregation. Rather, a visit was noted on the bottom of another form and no progress notes from the visit were ever recorded. (Paper 28, ¶¶ 59-60).

23

McKenna, 386 F.3d at 436 (citing higher burden for qualified immunity defense at pleading stage).  The Court must accept the allegations from the Amended Complaint that Simon knew of Rodriguez's suicide risk, knew that segregation exacerbated that risk, knew that the specific segregation unit did not have a correctional officer assigned to all shifts, but allowed Rodriguez to be placed there.  Based on these alleged facts, no reasonable officer would believe Simon's conduct was not unlawful.  Similarly, the facts alleging Carbonneau and Rutherford failed to take obvious steps to prevent Rodriguez's suicide could amount to deliberate indifference, foreclosing their qualified immunity defense.  Although Carbonneau put Rodriguez on 15 minute checks upon his admission to NSCF on September 22, 2003, this fact alone does not state an unequivocal qualified immunity defense.  Rather, the other alleged deficiencies in Carbonneau's response, taken in the light most favorable to the plaintiffs, precludes a finding of qualified immunity.  The facts alleged for Rutherford's conduct admittedly requires the Court to make an inference in the plaintiffs' favor; that Rutherford should have acted in response to the report stating Rodriguez had nothing to look forward to.

Although a qualified immunity defense is available on a 12(b)(6) motion, McKenna, 386 F.3d at 436, the facts in support of that defense do not appear on the face of the Amended Complaint for any of the three defendants here. The qualified immunity defenses of these officials would benefit from discovery to flesh out more thoroughly the circumstances and motivations of their conduct. Green, 722 F.2d at 1018 ("[t]he fate of an official qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial."); see also Rellergert, 924 F.2d at 796 ("To provide the fullest and best use, qualified immunity ideally is addressed by summary judgment."). The Court finds that reasonable officers would find the conduct of these defendants, as alleged in the Amended Complaint, was deliberatively indifferent to Rodriguez's serious medical needs as a pre-trial detainee in violation of his Fourteenth Amendment due process right. Accordingly, qualified immunity should not be granted to these defendants at this early stage.

                           CONCLUSION

For the foregoing reasons, the Court recommends that defendants' motion to dismiss be DENIED. (Papers 14 & 31).

Dated at Burlington, in the District of Vermont, this

                              25

30th day of March, 2007.


                               /s/ Jerome J. Niedermeier
                               Jerome J. Niedermeier
                               United States Magistrate Judge


Any party may appeal this Report and Recommendation within
10 days after service by filing with the clerk of the court
and serving on the magistrate judge and all parties, a
written statement of appeal which shall specifically
identify portions of the proposed findings, recommendations
or report objections. Failure to file objections within the
specified time waives the right to appeal the District
Court's order.  See Local Rule 72.1; 72.3, 73.1; 28 U.S.C.
§ 636(b)(1)(A); Fed. R. Civ. P. 72(b), 6(a) and 6(e).